IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

SAMUEL J. LOCKMON,                    )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )   Case No. 07-3231-CV-S-REL-SSA
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner                          )
of Social Security,                   )
                                      )
                    Defendant.        )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Samuel J. Lockmon seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's applications for a period of disability and disability insurance

benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff, subsequently

found disabled and awarded benefits by a different ALJ than the one in this case, argues that he

is entitled to benefits for the period between his alleged onset date (December 31, 2002) and the

date on which he was found to be disabled (April 11, 2005). I find that the record does not

support plaintiff's argument. Therefore, plaintiff's motion for summary judgment will be denied

and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

This suit involves two applications made under the Social Security Act. The first is an

application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq.,

filed on April 7, 2003 (Tr. 145-47). The second is an application for supplemental security

income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.,

also filed on April 7, 2003 (Tr. 373-77). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides

for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205. Plaintiff's applications were denied after administrative review (Tr. 125-29, 381-85).

On March 7, 2005, following a hearing, an administrative law judge (ALJ) rendered a decision in which he found that plaintiff was not under a "disability" as defined in the Social Security Act (Tr. 54-62).

On August 11, 2005, the Appeals Council of the Social Security Administration denied plaintiff's request for review (Tr. 47-49).

On October 28, 2005, plaintiff requested additional time in which to file a civil action. Because of a delay in processing that request, it was not until June 29, 2007, that the Appeals Council granted plaintiff an extension of 30 days from the date of plaintiff's receipt of the letter in which to file the civil action (Tr. 663).

A timely Complaint was filed in this court on July 30, 2007.

Therefore, the decision of the ALJ dated March 7, 2005, is the final decision of the Commissioner on review.

During the pendency of the proceedings described above, plaintiff filed another application for SSI benefits on April 11, 2005, alleging the same onset date as the previous applications, i.e., December 23, 2002 (Tr. 420-424). An ALJ granted plaintiff SSI benefits beginning April 11, 2005 (the date of plaintiff's application for supplemental security income), in a decision dated August 24, 2007 (Tr. 15-24). Since that decision was fully favorable to plaintiff, it is not before this court.

To place the medical and other records in context, I have inserted the date of plaintiff's alleged disability onset date (December 31, 2002) and the date the ALJ found plaintiff to be disabled (April 11, 2005) throughout this order for the purpose of highlighting what was known before and after these important dates.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers

can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

            Yes = not disabled.
            No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

            No = not disabled.
            Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

4

Yes = disabled.
No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.     *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert, Terri Crawford, in addition to documentary evidence admitted at the hearing. Although the record is largely a matter of stipulation between the parties, I have supplemented their submissions where I thought it necessary to fully and accurately portray the information available to the ALJ.

## A.      *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

Plaintiff's earnings statement reflects the following income for the years indicated:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1976 | $   904.81 | 1991 | 14,627.34 |
| 1977 | 3,059.78 | 1992 | 18,859.66 |
| 1978 | 4,526.69 | 1993 | 18,541.80 |
| 1979 | 2,644.22 | 1994 | 19,787.20 |
| 1980 | 12,639.25 | 1995 | 16,963.33 |
| 1981 | 12,644.00 | 1996 | 18,711.80 |
| 1982 | 0.00 | 1997 | 20,865.44 |
| 1983 | 5,653.09 | 1998 | 11,831.00 |

5

| 1984 | 0.00 | 1999 | 0.00 |
|---|---|---|---|
| 1985 | 13.40 | 2000 | 0.00 |
| 1986 | 0.00 | 2001 | 0.00 |
| 1987 | 3,411.75 | 2002 | 0.00 |
| 1988 | 3,300.00 | 2003 | 0.00 |
| 1989 | 11,071.91 | 2004 | 0.00 |
| 1990 | 10,855.01 | | |

(Tr. 157.)[1]

On April 3, 2003, plaintiff completed a Disability Report, in which he alleged disability due to a broken wrist, chest pains, chest numbness, swollen legs and feet, breathlessness, and high blood pressure (Tr. 158-67).

**B.    SUMMARY OF MEDICAL RECORDS**

On October 21, 1996, plaintiff (then age 35) sought treatment after he fell and broke his right wrist while he was working as a truck driver and helping unload his truck.  He was placed on light duty performing left-hand work only (Tr. 275-76).

On April 5, 1997, plaintiff was sent to see Paul R. Frewin, M.D., about his wrist and was authorized to return to work performing regular job duties (Tr. 271).

On March 5, 1997, plaintiff went to William Berner, M.D., for an office visit about his wrist.  His right wrist showed no soft-tissue swelling or tenderness and x-rays showed healing (Tr. 270).  The doctor allowed plaintiff to continue working at his regular job (Tr. 270).

---

[1]Although the earnings records show no income for the period between 1999 and 2004, medical and other records reflect plaintiff stating that he stopped working in 2002.

6

On April 14, 1997, Paul R. Frewin, M.D., examined plaintiff's wrist and rated plaintiff's injury as a five percent partial impairment that under AMA guidelines constitutes a three percent permanent impairment of the whole body (Tr. 269). Plaintiff was returned to work at his regular job (Tr. 269).

Plaintiff saw Dr. Dale Wheeler regularly in 2002 for blood pressure checks:

| Date | Blood Pressure[2] | Pulse[3] |
|------|-------------------|----------|
| June 23, 2002 | 139/90 | 110 |
| June 26, 2002 | 139/89 | 94 |
| June 27, 2002 | 137/94 | 93 |
| July 1, 2002 | 133/93 | 94 |
| July 24, 2002 | 124/80 | 84 |
| July 25, 2002 | 130/90 | 82 |
| August 9, 2002 | 126/80 | 80 |
| September 6, 2002 | 128/80 | 82 |
| September 26, 2002 | 130/90 | 80 |
| October 11, 2002 | 122/76 | 76 |

(Tr. 318).

**December 31, 2002, just over two months after the last measurement in this case, is plaintiff's alleged onset of disability.**

---

[2]Blood pressure of 120/80 or lower is normal; blood pressure of 140/90 or higher is high blood pressure; and 120 and 139 for the top number or between 80 and 89 for the bottom number is prehypertension. Medline Plus, http://www.nlm.nih.gov/medlineplus/highbloodpressure.html

[3]A normal pulse rate for a resting adult is between 60 and 100 beats per minute (BPM).

On January 6, 2003, Dr. Dale Wheeler diagnosed plaintiff with hypertension, dyspnea,[4] chest pains-intermittent, and COPD,[5] for which plaintiff was given prescriptions for an Albuterol inhaler[6] and nitroglycerin[7] (Tr. 313-15).

On January 10, 2003, plaintiff was admitted to St. Johns Regional Health Center and required to stay overnight for chest pains and respiratory difficulties after his blood pressure was measured at 154/94 (Tr. 286-90). Pulmonary function testing performed during his stay revealed findings consistent with mild COPD (Tr. 287). Specifically, the records state:

> With regard to patient's chest discomfort, patient has had it explained to him that the most likely cause is gastrointestinal disease. Patient was offered a proton pump inhibitor which he politely refused; as the patient states he will follow up with his primary doctor for this.
>
> Regarding patents's shortness of breath, this could in fact be due to patient's mild chronic obstructive pulmonary disease, as well as possibly with mildly decreased ejection fraction.[8] See above. We will provide patient an Albuterol inhaler, as well as instruction on how to use this.

(Tr. 288). In the social history section, plaintiff acknowledged that he chews tobacco and

---

[4]Dyspnea refers to difficulty in breathing, often associated with lung or heart disease.

[5]COPD stands for chronic obstructive pulmonary disease.

[6]An Albuterol inhaler helps relieve asthma symptoms.

[7]Nitroglycerin dilates (widens) blood vessels, making it easier for blood to flow through them and easier for the heart to pump.

[8]Ejection fraction is a measurement of the capacity at which the heart is pumping. During each heartbeat cycle, the heart contracts and relaxes. When the heart contracts, it ejects blood from the two pumping chambers (ventricles). When the heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it does not empty all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. Because the left ventricle is the heart's main pumping chamber, ejection fraction is usually measured only in the left ventricle (LV). A normal LV ejection fraction is around 55 to 70 percent.

8

drinks one or two beers a day (Tr. 289). Plaintiff was discharged without chest discomfort or significant respiratory difficulty (Tr. 288).

On January 11, 2003, plaintiff was evaluated for myocardial perfusion reserve and was found to have "no obvious evidence for stress-induced cardiac ischemia[9] . . . [and] normal resting left ventricular regional wall motion and wall thickening" (Tr. 293).

On January 11, 2003, plaintiff underwent a pulmonary function study (Tr. 298). The results showed minimal obstructive lung defect (Tr. 298).

On January 14, 2003, plaintiff went to Dr. Wheeler's office to follow up on his hospital visit. He was directed to see a cardiologist because the nitroglycerin they gave him helped (Tr. 312).

On January 28, 2003, plaintiff returned to Dr. Wheeler's office after he continued to experience fatigue, headaches, and shortness of breath (Tr. 311).

On January 30, 2003, plaintiff went to Dr. Ronnie Smalling who noted that plaintiff suffered from severe progressive hypertension and possible sleep apnea[10] (Tr. 323-24). Plaintiff's blood pressure was 124/108 on his left side and rechecked at 134/106 with a pulse of 92 (Tr. 324). Plaintiff weighed 223 pounds at the time (Tr. 324). The doctor noted that he did not believe that plaintiff's conditions were serious enough to restrict his driving "in terms of his DOT" (Tr. 324).

On February 11, 2003, plaintiff went to the office of Paul R. Frewin, M.D., after experiencing increased pain and "locking up" in his right wrist over the past year (Tr. 267).

---

[9]Cardiac ischemia is check pain caused by obstruction of the blood flow to the heart muscle.

[10]Sleep apnea is a sleep disorder characterized by pauses in breathing during sleep.

Plaintiff reported that he was not working but experienced difficulty "performing any hammering or resisted twisting" (Tr. 267). In the past medical history, plaintiff reported hypertension and suspected coronary artery disease for which he was undergoing testing (Tr. 267). Upon examination, Dr. Frewin noted that there was no soft tissue swelling or erythema but that plaintiff had severe direct tenderness in his wrist, as well as a positive Finkelstein's test,[11] with range of motion measured at 70 degrees dorsiflexion[12] and 45 degrees palmar flexion[13] (Tr. 267). X-rays revealed possible osteonecrosis[14] and de Quervain's stenosing tenosynovitis[15] in plaintiff's right wrist (Tr. 267). Dr. Frewin instructed plaintiff to wear a thumb speca wrist splint[16] and recommended that plaintiff restrict any work attempt to light duty work, performing predominantly left-handed work with a ten-pound weight limitation (Tr. 268).

On February 27, 2003, plaintiff went to Paul C. Freiman, M.D., for a follow-up visit on his hypertension (Tr. 281). Plaintiff was tentative about a sleep disorder study, and the doctor tried to get a sense about whether plaintiff would follow any recommendations made

---

[11]Finkelstein's test is used to diagnose DeQuervain's tenosynovitis in patients with wrist pain. The thumb is grasped with the four fingers into a fist, then the fist is bent toward the outside portion of the arm (the side opposite the thumb). Pain radiating up the inside of the arm from the thumb indicates positive Finkelstein's test.

[12]Dorsiflexion is flexing of the wrist so that the fingers are higher than the wrist, such as the position of the hands while typing. Normal is 60 degrees.

[13]Palmar flexion is the bending of the hand or fingers toward the palm. Normal is 70 degrees.

[14]Osteonecrosis is death of bone normally resulting from loss of blood supply to the bones.

[15]De Quervain's stenosing tenosynovitis is a disease associated with the wrist and hand in which there is irritation or swelling of the tendons found along the thumb side of the wrist.

[16]A thumb speca wrist splint is used for wrist immobilization.

by the study but was unable to get a "feel for that" (Tr. 281). Plaintiff's blood pressure was 120/88 and his pulse was 102 (Tr. 281).

On March 25, 2003, plaintiff went to a sleep disorder center and was found to be in no distress but diagnosed with elevated hypertension, dyspnea and lower extremity edema,[17] and a history of snoring (Tr. 279-80).

On April 2, 2003, plaintiff underwent a sleep study which revealed that plaintiff had mild obstructive sleep apnea syndrome and mild periodic limb movements of sleep (Tr. 284-85). At the time, plaintiff weighed 239 pounds and stood 5' 10" (Tr. 284). The study reflected that plaintiff was normotensive[18] and in normal sinus rhythm,[19] with an average heart rate of 70 beats per minute. No significant arrhythmias[20] were noted (Tr. 284).

On April 21, 2003, plaintiff returned to Dr. Wheeler's office and was noted to be experiencing occasional chest pain, shortness of breath, and hypertension, as well as feet edema (Tr. 307).

On May 1, 2003, plaintiff was examined by Dr. Smalling and reported that he had been experiencing dizziness as a result of his medications (Tr. 321). Dr. Smalling noted that during his examination plaintiff experienced a dizzy spell with a heart rate measured at 130 beats per minute, all of which was caught on an event monitor (Tr. 321). In response to

---

[17]Lower extremity edema is fluid buildup in the interstitial compartment of the extravascular space.

[18]Normotensive means having normal blood pressure, and not hypertensive or hypotensive.

[19]Sinus rhythm is the normal beating of the heart as measured by an electrocardiogram (ECG).

[20]Arrhythmia means an irregular heartbeat or one that is either faster or slower than normal.

11

plaintiff's frustration with his blood pressure, the doctor observed that plaintiff was much better than when they started treatment and that they would eventually "get there" (Tr. 321). The doctor also noted that although plaintiff was found to have sleep apnea, he was not going to pursue further evaluation (Tr. 321). In addition to severe hypertension and possible sleep apnea, Dr. Smalling diagnosed plaintiff to be suffering from dizziness and palpitations (Tr. 321). The doctor observed that plaintiff appeared "to be in good general health" (Tr. 321).

On August 28, 2003, Dr. Smalling noted that "[h]is blood pressures by the record he has brought us seem to be significantly improved. He is most of the time running in the 120s to low 140s over 80s and low 90s" (Tr. 326). Plaintiff was continuing to experience occasional dizzy spells (Tr. 326). The doctor's plan stated that "[w]e feel like we finally have his blood pressure under control" (Tr. 326).

On October 4, 2003, plaintiff went to the emergency room at St. Johns Hospital with pain and swelling in his left foot, subsequently diagnosed as gout,[21] for which plaintiff was given prescriptions for Medrol[22] and Darvocet[23] (Tr. 334).

On October 22, 2003, plaintiff was examined by Dr. Ronald Buening for pain and swelling in his right foot, also found to be an acute gout attack (Tr. 330-31).

On October 29, 2003, plaintiff underwent an MRI of his abdomen that revealed an abnormal increased signal in his liver, but everything else was unremarkable (Tr. 357). The

---

[21]Gout is a condition resulting from an overflow of crystals of uric acid deposited in tissues of the body and has recurring attacks of joint inflammation or arthritis.

[22]Medrol is a steroid. It prevents the release of substances in the body that cause inflammation.

[23]Darvocet is a narcotic painkiller.

12

handwritten note on the document reads "normal flow to kidneys" and is signed presumably by the doctor (Tr. 357).

On November 19, 2003, Dr. Buening noted that plaintiff was continuing to experience pain and swelling in his right foot as a result of his gout and had a blood pressure of 148/80 (Tr. 328-29).

In January, February, and March of 2004, plaintiff was examined by Dr. Wheeler on four occasions and diagnosed with hypertension, gout, coronary artery disease, hyperlipidemia,[24] sleep apnea, and COPD (Tr. 346-352).

On March 26, 2004, Dr. Wheeler also noted that plaintiff's dyspnea continued to persist (Tr. 346).

On April 22, 2004, plaintiff underwent a stress test which revealed "[n]o definite echocardiographic evidence of ischemia[25] at low workload and peak heart rate. However, assessment was somewhat difficult due to image quality and severe tachycardia"[26] (Tr. 505).

On April 27, 2004, plaintiff went to Dr. Smalling with a blood pressure of 152/100, and was subsequently diagnosed with hypertension, dizziness, palpitations, and mild sleep apnea, for which Dr. Smalling increased plaintiff's dosage for Doxazosin[27] (Tr. 361).

Four months later, on September 1, 2004, Dr. Smalling examined plaintiff and noted that his hypertension was pretty well controlled, although that day the blood pressure was

_____

[24]Hyperlipidemia refers to high cholesterol.

[25]Ischemia is insufficient blood going to an organ usually caused by a blocked artery.

[26]Tachycardia is an abnormally rapid heart rate.

[27]Doxazosin is used to treat hypertension.

Case 6:07-cv-03231-REL   Document 23   Filed 02/11/09   Page 13 of 33

156/98 with a pulse of 92. (Tr. 504). The doctor also noted that plaintiff had mild sleep apnea, but was in "general good health" (Tr. 504).  The doctor's note states:

> Unfortunately, the patient ran out of his 8 mg Doxazosin tablets and has been taking 4 mg for a few days and his blood pressure is up a little bit today.  He states that at home he has been running 130's/80s most of the time.

(Tr. 504.)

Four months later, on January 1, 2005, Dr. Wheeler noted that plaintiff continued to experience symptoms as a result of hypertension, hyperlipidemia, gout, and tachycardia, and he measured plaintiff's blood pressure at 142/92 (Tr. 510).

On March 16, 2005, plaintiff went to Michael D. Ball, D.O.  Plaintiff's blood pressure was 142/100 (Tr. 516).

On April 1, 2005, Dr. Ball increased plaintiff's prescription for Sular[28] after plaintiff's blood pressure measured 180/120 (Tr. 516).

On April 8, 2005, plaintiff was seen by Dr. Ball.  Plaintiff's blood pressure was 160/80 (Tr. 515).

**Plaintiff's subsequent case resulted in a finding that plaintiff became disabled on April 11, 2005.**

On April 19, 2005, plaintiff returned to Dr. Ball, and his blood pressure was 148/90 (Tr. 515).

On April 26, 2005, plaintiff was examined by Dr. Tasadus Fazili for hypertension, tachycardia, and lower back pain, during which time Dr. Fazili noted:

---

[28]Sular is used to treat hypertension.

14

[Plaintiff] has [history] of intermittent chest pain and shortness of breath the past 2 years or so. He has had two stress tests, initial one in 1/03 and the last one in 4/04, both done at St. John's, which, as per the patient, did not show any evidence of ongoing cardiac ischemia. He says that he also had a stress echo done in St. John's last year, which, per him, was negative. Seems that patient had a work up done for tachycardia with, what sounds to be, a MRA of his renal arteries, as well as 24 hour urine studies, in St. John's and the patient was told was negative. He also had a sleep study and was told to use a C-pap[29] at night, but he's not been doing this because he can't tolerate the mask.

(Tr. 529). Dr. Fazili also noted that upon examination plaintiff had diminished sensation in both feet with slow reflexes. (Tr. 529). Dr. Fazili ordered plaintiff to undergo an MRI of his back which showed multilevel degenerative disc disease from the L2-S1 levels, mild bilateral neural foraminal stenosis, and mild congenital central spinal stenosis from the L4-S1 levels. (Tr. 529-32). Dr. Fazili diagnosed plaintiff with degenerative disc disease and gave plaintiff a prescription for Ultracet[30] (Tr. 528).

On May 10, 2005, plaintiff went to Dr. Fazili (Tr. 527). Initially, Dr. Fazili noted that plaintiff had an abnormal EKG (electrocardiogram) during a stress test with a hypertensive response to the test, and diagnosed plaintiff with gout, sleep apnea, multilevel degenerative disc disease, and hyperlipidemia (Tr. 527). He then ordered a Cardiolite stress test[31] (Tr. 527). Dr. Fazili noted that plaintiff continued to experience chest pain and ordered plaintiff to

---

[29]C-Pap (continuous positive airway pressure) is a device used to treat sleep apnea. Obstructive sleep apnea occurs when the upper airway becomes narrow as the muscles relax naturally during sleep. This reduces oxygen in the blood and causes arousal from sleep. The C-PAP machine stops this phenomenon by delivering a stream of compressed air via a hose to a nasal pillow, nose mask or full-face mask, splinting the airway (keeping it open under air pressure) so that unobstructed breathing becomes possible, reducing and/or preventing apneas.

[30]Ultracet is a narcotic-like painkiller used to treat moderate to severe pain.

[31]A chemical stress test, as opposed to the traditional treadmill stress test. Rather than the patient walking on a treadmill to get the heart rate up, Cardiolite is injected into the blood stream which results in a rapid heart rate.

15

undergo another stress test, the results of which were positive for ischemia and demonstrated a technically poor exercise tolerance after plaintiff's blood pressure was measured at 176/110 (Tr. 527; 540-41). Concerning the results of the cardiolite stress study, Dr. Fazili's findings were:

> There is almost uniform distribution of activity throughout left myocardium on both stress and resting images without evidence of focal abnormalities. No Ischemic/reversible findings were noted. Ejection fraction [see footnote 8] and wall motion studies appear within normal limits. Ejection fraction is 62%. Normal is 50% or more.

(Tr. 542.) The doctor concluded that the cardiolite stress study was within normal limits (Tr. 542).

On May 18, 2005, an EKG revealed sinus rhythm with right bundle branch block and left anterior fasciolar blockage (Tr. 624). The doctor ordered a cardiac echo to evaluate plaintiff's valves before an angiogram[32] (Tr. 624).

On May 23, 2005, a cardiac catheterization[33] was performed and failed to reveal any abnormalities (Tr. 549-50). The doctor's impression was "1. Normal coronary arteries. 2. Normal left ventricular systolic function" (Tr. 550). The summary of plaintiff's hospital visit concluded:

> The patient was found to have normal coronary arteries, normal left ventricular systolic function with an ejection fraction of 65 percent, and no regional wall motion abnormalities on coronary angiogram. The patient tolerated the procedure well. An Angio-Seal was placed and the patient was discharged to home in stable condition.

(Tr. 551).

---

[32]An angiogram is used to diagnose disease in the cardiovascular system.

[33]Cardiac catheterization is a procedure in which one or more catheters are inserted through the arm or leg to gather information about blood supply through the coronary arteries, blood pressures, blood flow, etc.

16

On June 14, 2005, plaintiff underwent another MRI of his back after he continued to experience pain in his neck and back, shortness of breath, heartburn, increased pain in his right wrist, and numbness in his hands (Tr. 565, 560). The MRI revealed a disc protrusion with osteophyte at the T1 and T2 levels, as well as protrusions at the C2-3, C3-4, C4-5, and C5-6 levels (Tr. 560). Dr. Fazili then diagnosed plaintiff with gout, sleep apnea, hypertension and hyperlipidemia-currently controlled, possible GERD (gastro-esophageal reflux disease), and lower back pain which may radiate and be causing plaintiff's chest pains, for which he gave plaintiff a prescription for Ultracet, a narcotic-like pain reliever for moderate to severe pain (Tr. 564).

On June 17, 2005, Donald McGehee, Ed.D., began treating plaintiff after plaintiff was diagnosed with severe mental depression (Tr. 611-12).

Between June 17, 2005, and March 4, 2006, Dr. McGehee treated plaintiff for depression and anxiety on about five occasions (Tr. 607-612).

On November 22, 2005, and December 25, 2005, Michael D. Ball, D.O., continued to treat plaintiff for his back pain. On exam he noted that plaintiff's lower back pain was radiating into his legs, and he gave plaintiff prescriptions for Ultracet and Vicodin[34] (Tr. 599-600).

Throughout 2006, Dr. Ball continued to treat plaintiff, examining him on about sixteen occasions for back and neck pain, depression, headaches, osteoarthritis, bilateral foot pains, hypertension, degenerative joint disease, gout, and COPD (Tr. 595-99, 628-31, 662).

_____

[34]Vicodin is a narcotic pain reliever.

Case 6:07-cv-03231-REL   Document 23   Filed 02/11/09   Page 17 of 33

On January 4, 2006, Dr. Ball prescribed Celexa[35] after examining plaintiff for depression, lower back pain, and frequent headaches (Tr. 599).

In March and April of 2006, Dr. Ball continued to treat plaintiff with Vicodin, Soma (muscle relaxer), and Lexapro (antidepressant) for his pain (Tr. 595-96).

In May and June of 2006, Dr. Ball, after examinations, continued to prescribe Vicodin, Ultram, and Flexeril for plaintiff's back pain and degenerative joint disease (Tr. 595-96).

In July and August of 2006, plaintiff was treated for gout in addition to hypertension and lumbar pain (Tr. 630).

On August 31, 2006, and September 28, 2006, plaintiff was diagnosed with osteoarthritis[36] in his lumbar spine (Tr. 629).

On November 28, 2006, Dr. Ball noted that plaintiff continued to experience bilateral foot pain (Tr. 628).

On December 28, 2006, Dr. Ball again noted that plaintiff was experiencing complications resulting from back pain and COPD, for which he gave plaintiff a prescription for Advair[37] (Tr. 662).

In 2007 plaintiff continued to receive treatment from Dr. Ball. Dr. Ball examined plaintiff about five times from January through April of 2007, during which time plaintiff's symptoms continued to persist (Tr. 660-62).

_____

[35]Celexa is an anti-depressant.

[36]Osteoarthritis is a progressive disorder of the joints caused by the loss of cartilage.

[37]Advair is used to treat asthma and COPD.

18

C.    *SUMMARY OF ADMINISTRATIVE HEARING*

On May 11, 2004, an administrative hearing, was held.  Plaintiff testified that he was 42 years old at the time (Tr. 668). He had a tenth grade education and previous work experience as a truck driver, factory worker, and lumber yard worker (Tr. 668, 671).

Plaintiff testified that he fractured his right wrist at work in 1996 and experiences difficulty gripping objects due to numbness in his hands.  He can only lift ten pounds with his right arm (Tr. 670, 677-78). Plaintiff also testified that he had to stop working as a truck driver because he was unable to pass a DOT physical due to his high blood pressure (Tr. 672-3).

Plaintiff testified that he has to elevate his feet and legs to help relieve swelling and is only able to sit continuously for fifteen to twenty minutes (Tr. 674, 676). Plaintiff testified that he easily becomes short of breath with minimal activities, can stand for twenty minutes at a time, and can only walk 125 feet before he needs to sit down and catch his breath (Tr. 676).

When asked about his capabilities, plaintiff testified that he was able to help his wife load the dishwasher and do laundry (Tr. 674).

Plaintiff also stated that he hoped his gout was under control with medication (Tr. 683).

**D. MEDICAL SOURCE STATEMENTS AND EVALUATIONS**

**1.    Medical Source Statements - Physical**

On April 19, 2005 -- eight days after plaintiff's onset of disability according to the second ALJ opinion -- Michael D. Ball, D.O., completed a medical source statement-physical (Tr. 518-19). Dr. Ball opined that plaintiff retained the residual functional capacity to lift

19

and/or carry ten pounds frequently and 20 pounds occasionally, stand and/or walk for one hour continuously and five hours throughout an eight-hour workday, and sit for one hour continuously and five hours throughout an eight-hour work day (Tr. 518). Dr. Ball opined that plaintiff could only occasionally climb, stoop, kneel, crouch, and crawl, and that he needed to avoid concentrated exposure to extreme heat and cold, hazards, and heights (Tr. 519).

In July of 2005, Dr. Ball completed another medical source statement-physical (Tr. 586-87). Dr. Ball opined that plaintiff retained the residual functional capacity to lift and/or carry ten pounds frequently and 25 pounds occasionally, stand and/or walk for one hour continuously and four hours throughout an eight-hour workday, and sit for one hour continuously and four hours throughout an eight-hour work day (Tr. 586). In addition, Dr. Ball opined that plaintiff's ability to push and/or pull was limited due to c-spine degeneration that limits his ability to reach, push/pull, and grip (Tr. 587). Dr. Ball opined that plaintiff could never crawl; could only occasionally climb, stoop, kneel, crouch, reach, and handle; and needed to avoid any exposure to extreme heat, hazards, and heights (Tr. 519). Dr. Ball also stated that plaintiff's use of muscle relaxers and narcotics may cause drowsiness (Tr. 587).

On December 22, 2005, Dr. Ball completed his third medical source statement-physical of the year (Tr. 589). Dr. Ball opined that plaintiff retained the residual functional capacity to lift and/or carry ten pounds frequently and 25 pounds occasionally, stand and/or walk for one hour continuously and four hours throughout an eight-hour workday, and sit for one hour continuously and four hours throughout an eight-hour work day (Tr. 589). Furthermore, Dr. Ball opined that plaintiff could never crawl; only occasionally climb, stoop, kneel, crouch, reach, and handle; and needed to avoid any exposure to extreme heat, hazards,

and heights (Tr. 590). Dr. Ball noted that plaintiff's medications cause sedation (Tr. 590).

On March 28, 2006, Dr. Ball completed a fourth medical source statement-physical (Tr. 592). Dr. Ball opined that plaintiff retained the residual functional capacity to lift and/or carry ten pounds frequently and 20 pounds occasionally, stand and/or walk for one hour continuously and three hours throughout an eight-hour workday, and sit for 45 minutes continuously and three hours throughout an eight-hour work day (Tr. 592-93). Dr. Ball opined that plaintiff could never climb or crawl; could only occasionally stoop, kneel, crouch, reach, and handle; and needed to avoid any exposure to extreme heat and cold, hazards, and heights (Tr. 593). Dr. Ball opined that plaintiff's ability to push and/or pull was limited in his hands and feet due to degenerative joint disease in his cervical and lumbar spine, and stated that plaintiff's medications may cause drowsiness. (Tr. 593).

On June 20, 2006, Dr. Ball completed a fifth medical source statement-physical (Tr. 602-03). Dr. Ball opined that plaintiff retained the residual functional capacity to lift and/or carry ten pounds frequently and 15 pounds occasionally, stand and/or walk for one hour continuously and three hours throughout an eight-hour workday, and sit for 45 minutes continuously and three hours throughout an eight-hour work day (Tr. 602-03). Dr. Ball opined that plaintiff could never climb or crawl; could only occasionally stoop, kneel, reach, or handle; should avoid any exposure to extreme heat, extreme cold, hazards, and heights; should avoid moderate exposure to wetness, humidity, dust, fumes, and vibrations; and should avoid concentrated exposure to weather (Tr. 603). Dr. Ball opined that plaintiff's ability to push and/or pull was limited and stated that plaintiff's medications may cause drowsiness (Tr. 603).

On April 26, 2007, Dr. Ball completed a sixth medical source statement-physical (Tr. 657-58). Dr. Ball opined that plaintiff retained the residual functional capacity to lift and/or carry five pounds frequently and ten pounds occasionally, stand and/or walk for 45 minutes continuously and two hours throughout an eight-hour workday, and sit for 30 minutes continuously and three hours throughout an eight-hour work day (Tr. 657). Dr. Ball opined that plaintiff could never climb, stoop, kneel, crouch, or crawl; could only occasionally balance, reach, or handle; and should avoid any exposure to extreme heat, extreme cold, hazards, and heights (Tr. 657-58). Dr. Ball opined that plaintiff's ability to push and/or pull was limited due to degenerative joint disease in his cervical and lumbar spine, and he stated that plaintiff's medications may cause drowsiness (Tr. 658).

## 2.    Medical Source Statements - Psychological

On May 2, 2005[38] -- three weeks after plaintiff's onset of disability according to the second ALJ opinion -- Donald E. McGehee, Ed.D., completed a medical source statement-mental in which he opined that plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond

_____

[38]This consultative exam occurred a month or so before Dr. McGehee started treating plaintiff.

appropriately to changes in the work setting (Tr. 524-25). Dr. McGehee opined that plaintiff was moderately limited in his ability to understand and remember detailed instructions, carry out very short and simple instructions, carry out detailed instructions, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work related decisions, interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others (Tr. 524-25).

### 3.    Consulting Medical Examinations

On June 7, 2004, Dewey Ballard, M.D., performed a disability assessment of plaintiff (Tr. 364-65). He noted that plaintiff was alert and oriented (Tr. 364). The doctor's letter reflects that:

> [Plaintiff] ... has a history of recurring chest pain. He has had negative stress test previously and does see a cardiologist. He has never had a heart catheterization. The chest pain occurs without a definite pattern. It occurs three to five times weekly and is substernal, sharp, and lasts several minutes.

(Tr. 364. At the time, plaintiff weighed 231 pounds, and his blood pressure was 160/112 with a pulse of 80 (Tr. 364).

Plaintiff's lungs were clear and heart sounds were regular (Tr. 364). Plaintiff had no edema and was able to get off and on the examination table without difficulty (Tr. 364). Plaintiff had difficulty rising from a squatting position, but had full flexion of the lumbar spine (Tr. 364). His right wrist had no swelling, but had limited range of motion (Tr. 364). Plaintiff's left wrist was normal (Tr. 364). Dr. Ballard noted that plaintiff had poorly

Case 6:07-cv-03231-REL   Document 23   Filed 02/11/09   Page 23 of 33

controlled hypertension (Tr. 365).

On June 7, 2004, Dewey Ballard, M.D., completed a Medical Source Statement of Ability to Do Work-Related Activities (Tr. 366). He opined that plaintiff could lift up to 20 pounds occasionally and up to ten pounds frequently (Tr. 366). Dr. Ballard noted that plaintiff's ability to stand, walk, and sit were not affected by his impairments (Tr. 367). He opined that plaintiff could never climb, balance, or crouch (Tr. 367). Dr. Ballard noted that plaintiff was unlimited in manipulative functions (Tr. 368). In interrogatory questions dated July 7, 2004, Dr. Ballard clarified that, while plaintiff's uncontrolled hypertension put him at risk for serious medical problems, it was not causing any symptoms at the time (Tr. 371).

Ten months after Dr. Ballard completed the June 7, 2004, medical source statement, i.e., on April 11, 2005, plaintiff became disabled according to the second ALJ opinion.  About two years later, on March 20, 2007, plaintiff underwent a physical consultative exam by Dr. Ted Lennard (Tr. 641-51). Dr. Lennard diagnosed plaintiff with lower back pain and opined that plaintiff retained the ability to lift and/or carry ten pounds occasionally or frequently; stand and/or walk for two hours throughout an eight-hour work day; sit less than six hours throughout an eight-hour work day; was limited in his ability to push and/or pull in his lower extremities; could occasionally climb, balance, kneel, crawl, or stoop; could never crouch; and needed to avoid hazards (Tr. 647-51). Dr. Lennard opined that plaintiff needed to lie down and/or recline two times a day for thirty minutes at a time due to his lumbar degenerative changes (Tr. 647). In a response to interrogatories from ALJ Fromme, Dr. Lennard clarified that in his opinion plaintiff could stand and/or walk for four hours in an eight-hour day, and sit for four hours throughout an eight-hour day (Tr. 654-55).

4.       **Consulting Psychological Examinations**

On May 2, 2005 -- three weeks after plaintiff's onset of disability according to the second ALJ opinion -- plaintiff underwent a psychological evaluation performed by Dr. Donald McGehee, Ed.D. (Tr. 520-22). At the time, plaintiff weighed 227 pounds and was 5' 11" tall (Tr. 520). Dr. McGehee noted that plaintiff appeared severely depressed and significantly withdrawn from other people; and upon examination testing revealed that plaintiff was markedly depressed and extremely withdrawn, had a distorted thought process, was paranoid with likely delusions, and experienced chronic anger (Tr. 520-22). Dr. McGehee diagnosed plaintiff as suffering from a major depressive disorder with psychotic features and a personality disorder with borderline, narcissistic, and antisocial characteristics. He assessed plaintiff with a GAF of only 31,[39] and held that he met the criteria for medical assistance (Tr. 522).

On June 29, 2005, G. Sutton, Ph.D., completed a psychiatric review technique concerning plaintiff in which he opined that plaintiff's mental impairments were severe, but in his opinion were not expected to last twelve months (Tr. 566). Furthermore, Dr. Sutton stated that there was insufficient evidence in the record from December 23, 2002, to May of 2005, from which to determine whether plaintiff had a medically determinable psychiatric impairment during that period. (Tr. 578).

---

[39]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

On March 20, 2007, plaintiff underwent a psychiatric evaluation by Dr. Alwyn Whitehead, Psy.D. (Tr. 639). Dr. Whitehead diagnosed plaintiff as having moderate-to-severe major depressive disorder causing plaintiff to display depressed behavior. The doctor opined that plaintiff was moderately impaired in his ability to interact with coworkers and supervisors (Tr. 639).

## V.    FINDINGS OF THE ALJ

On March 7, 2005, ALJ George R. Wilhoit issued an unfavorable decision (Tr. 51-62). The ALJ concluded that plaintiff suffers from the severe impairments of hypertension and a muscular and connective tissue injury in his right arm (Tr. 81). In addition, the ALJ concluded that plaintiff had no limitations in sitting, standing, and walking; no functional limitations in using his non-dominant left hand; is required to wear a splint of his right hand and his ability to use his dominant right hand in lifting and carrying is limited to ten pounds and no more than occasional gripping and handling (Tr. 61). The ALJ held that plaintiff could not perform any of his past relevant work but that he could perform a wide range of light work including working as an usher and a counter clerk, and therefore was not disabled (Tr. 60, 62).

On August 24, 2007, ALJ David Fromme issued a favorable decision on a subsequent application plaintiff had filed for Supplemental Security Income, finding plaintiff to be disabled as of April 11, 2005, the date of his subsequent application (Tr. 16-24).

## VI.    SEVERE IMPAIRMENTS

Plaintiff argues that the ALJ erred in failing to find that plaintiff's chronic obstructive pulmonary disease, gout, and sleep apnea were severe impairments.

A severe impairment is an impairment or combination of impairments which

26

significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a)    Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)    Capacities for seeing, hearing, and speaking;

(3)    Understanding, carrying out, and remembering simple instructions;

(4)    Use of judgment;

(5)    Responding appropriately to supervision, co-workers and usual work situations; and

(6)    Dealing with changes in a routine work setting.

The evidence in the record establishes that plaintiff's ability to perform basic work activities was not limited by his gout, COPD, or sleep apnea.

The records on gout or leg/foot pain show entries on April 21, 2003 (Tr. 307); October 2, 2003 (Tr. 351); October 4, 2003 (Tr. 334); October 22, 2003 (Tr. 330-31); November 19, 2003 (Tr. 328-29); and February 18, 2004 (Tr. 349-50). Most of these are entries simply acknowledging plaintiff's complaint about gout, foot pain, or foot swelling. None of the records state or infer that the condition limited plaintiff's ability to perform basic work

27

activities. Indeed, during the May 11, 2004, administrative hearing, plaintiff stated that he was hopeful that his gout was then under control with medication (Tr. 683).

The medical records do not support a finding that plaintiff's gout was a severe impairment. None of the medical records indicates that plaintiff's activities were restricted in any way because of gout. Aside from medication, plaintiff was told to follow a gout diet. No doctor ever told him to limit any physical activity due to his gout, and he never complained to any doctor that his activities were significantly limited due to symptoms of gout.

For example, on April 21, 2003, the doctor believed plaintiff's lower extremity edema was caused by hypertension (Tr. 308). On October 4, 2003, plaintiff told the doctor that it was "not bad now, but I'm not moving around." (Tr. 336). On October 22, 2003, and on November 19, 2003, plaintiff complained of pain in his right foot, even though it had been better when he was on Medrol (Tr. 328). Plaintiff was diagnosed with "acute" gout (as opposed to chronic) and was told to go back on the Medrol (Tr. 329). On February 18, 2004, although plaintiff was diagnosed with gout (among other things), the examination notes indicate that edema was "normal" (Tr. 350). Plaintiff was not given medication for the gout, nor was he instructed to avoid any activities. On January 11, 2005, gout was listed in the diagnoses, but plaintiff was not treated for gout, no activities were limited, and edema is listed as "normal" (Tr. 510).

The record supports the ALJ's finding that plaintiff's gout was not a severe impairment.

As to sleep apnea, plaintiff went to Dr. Ronnie Smalling on January 30, 2003, and was observed to have possible sleep apnea along with his hypertension (Tr. 323-24). Interestingly,

the doctor noted that plaintiff's conditions (sleep apnea and hypertension) were not serious enough to restrict his driving "in terms of his DOT;" i.e., Department of Transportation regulations for over-the-road truck drivers (Tr. 324). On April 2, 2003, plaintiff underwent a sleep study, which showed that he was normotensive (having normal blood pressure) and his heart rate and rhythm was normal (Tr. 284). In addition, plaintiff declined to pursue any further evaluation of his sleep apnea (Tr. 321), and abandoned his use of the C-PAP machine (Tr. 529). When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

Plaintiff's records on respiratory problems during this period show that (1) he was diagnosed with mild chronic obstructive pulmonary disease, which was being treated with an Albuterol inhaler (Tr. 288); and (2) a pulmonary function study conducted on January 11, 2003, confirmed that plaintiff had minimal obstructive lung defect (Tr. 298). However, the records do not establish that plaintiff's COPD interfered with his ability to do basic work activities. On October 2, 2003, plaintiff reported shortness of breath only on exertion, and on exam his lungs were normal. On February 18, 2004, he reported shortness of breath, but again his lungs were normal on exam. He was diagnosed with "mild" chronic obstructive pulmonary disease. On March 15, 2004, the doctor noted slight decreased breath sounds, even though plaintiff reported that he was having no shortness of breath. On March 26, 2004, plaintiff was examined again and his lungs were normal.

Plaintiff's treating physicians did not restrict plaintiff's activities due to chronic obstructive pulmonary disease.

Based on all of the above, I find that the ALJ did not err in finding that plaintiff's gout, sleep apnea, and chronic obstructive pulmonary disease were not severe impairments.

## VII.    RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff next argues that the ALJ erred in calculating plaintiff's residual functional capacity because the RFC is vague and unrelated to any medical evidence. Specifically plaintiff complains that the ALJ failed to consider the effects of plaintiff's non-severe impairments, and failed to include specific limitations for plaintiff's dizziness, chest pain and shortness of breath related to hypertension.

Residual functional capacity is what a claimant can still do despite his limitations. 20 C.F.R. §§ 404.1545(a) and 416.945(a). It is an assessment based on all of the relevant evidence, including a claimant's description of his limitations, observations by treating and examining physicians or others, and medical records. 20 C.F.R. §§ 404.1545(a) and 416.945(a).

The ALJ found that plaintiff retained the residual functional capacity to sit, stand and walk without limitation; use his non-dominant left hand without limitation; must wear a splint on his right hand; is limited to ten pounds when using his right hand; and may only occasionally grip and handle.

The ALJ noted the reports of treating physician Dr. Paul Frewin who found that plaintiff could perform light right-handed work while wearing a brace, and he could perform predominantly left-handed work. He cited plaintiff's treating physician, Dr. Smalling, who in

30

2003 indicated that plaintiff's blood pressure was under control with medication. In 2004, Dr. Smalling noted that plaintiff's blood pressure was somewhat up and down, but he merely adjusted plaintiff's medication. All other tests were normal. Plaintiff was treated by Dr. Dale Wheeler who found no abnormalities, a finding noted by the ALJ. The ALJ also noted that plaintiff testified that Dr. Wheeler told him to stop working; however, Dr. Wheeler's records contain no such recommendation and in fact contain no significant clinical or laboratory abnormalities. The ALJ noted that none of plaintiff's treating physicians recommended any restrictions in his activities, i.e., no one recommended that plaintiff limit in any way his sitting, standing, or walking.

Although plaintiff argues the ALJ should have considered his non-severe impairments, as discussed above, there is no evidence that these non-severe impairments limited plaintiff's basic activities in any way, not alone or in combination with his severe impairments.

Concerning plaintiff's hypertension, the evidence demonstrates that during the period in question plaintiff's blood pressure was a serious concern and, at times, was too high. However, the overall picture is one of generally successful control through medication. For example, on August 28, 2003, the doctor noted that plaintiff's blood-pressure readings had significantly improved with "most running in the 120s, to low 140s over 80s and 90s" and the doctor concluding that "[w]e feel like we finally have his blood pressure under control" (Tr. 326); and on September 1, 2004, his doctor noted that plaintiff's hypertension was pretty well under control, running 130s/80s most of the time (Tr. 504).

Plaintiff's heart problems during the relevant period included chest pain and irregular and racing heart rhythms, for which he was treated with medication and nitroglycerin.

31

However, the cause of plaintiff's chest pain and irregular and racing heart went largely undiagnosed during this time frame.

Based on the above, I find that the relevant medical records, i.e., the records relevant to plaintiff's condition prior to April 11, 2005, support the ALJ's residual functional capacity assessment.

## VIII.  STEP FIVE OF THE SEQUENTIAL ANALYSIS

Finally, plaintiff argues that the ALJ erred in finding that plaintiff could perform other work because (1) the residual functional capacity assessment relied on by the vocational expert was vague, and (2) the ALJ did not resolve the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles.

Plaintiff's argument with regard to the residual functional capacity assessment has been addressed above and is without merit.

During the administrative hearing, the ALJ asked the vocational expert to state whether her testimony varied with the Dictionary of Occupational Titles (Tr. 684).  The hypothetical at issue involved an individual who could perform light work (Tr. 685).  Light work can require "a good deal of walking or standing, or . . . sitting most of the time".  20 C.F.R. § 416.967.  The ALJ found that plaintiff had no limitations on sitting, standing, or walking.  The hypothetical also involved a person who had "very limited use of the right hand and arm."  The ALJ found that plaintiff must wear a splint on his right hand, is limited to ten pounds when using his right hand, and may only occasionally grip and handle.  This is actually less restrictive than the "very limited use" restriction in the hypothetical.

The jobs of counter clerk and usher, both jobs that a person described in the

32

hypothetical could perform according to the vocational expert, are classified in the Dictionary of Occupational Titles as light jobs. Both positions require reaching, handling, and fingering up to one-third of the time, which is consistent with occasional use of the right hand. DOT at 249,366-010, 344,677-014. Additionally, while light work can include lifting up to 20 pounds, work can also be classified as light when it requires negligible lifting and significant standing or walking. 20 C.F.R. §§ 404.1567(b) and 416.967(b). Therefore, the vocational expert's testimony does not conflict with the Dictionary of Occupational Titles.

## IX. CONCLUSION

My review is limited to determining whether there is substantial evidence in the record to support the decision of the Commissioner. If there is, the Commissioner must be affirmed.

Here, the evidence shows that some of plaintiff's complaints did not even exist for the period in question and therefore could not have been considered by the Commissioner; some of plaintiff's complaints were de minimus in nature and could not have formed the basis for a finding of disability; and the balance of plaintiff's complaints, which amounted to serious conditions, appeared at the time to be either unsubstantiated by the medical records or adequately controlled by medication. Based on this record, find that the ALJ's decision to deny benefits for the period between December 23, 2002, and April 11, 2005, is supported by substantial evidence in the record as a whole.

Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

   /s/ Robert E. Larsen   
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 11, 2009